IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| JUSTIN PANUS, | § | |
| Institutional ID No. 02167693 | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 1:23-cv-00086-BU |
| | § | |
| PATRICK L O'DANIEL, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff Justin Panus, an inmate serving a life sentence plus 10 years at the Texas
Department of Criminal Justice's (TDCJ) Robertson Unit, brings this action against six
defendants, all government officials and employees of TDCJ, alleging they violated his
constitutional rights by failing to provide him with adequate food and clean water. Although Panus paid the filing fee and is not proceeding *in forma pauperis, see* Dkt. No. 4,
his claims are subject to judicial screening because he sues government officials. *See* 28
U.S.C. § 1915A; Dkt. No. 21.

For the reasons below, the undersigned recommends that the Court dismiss Panus's
claims without prejudice.[1]

---

[1] As explained below, the undersigned finds that the *Ex parte Young* exception to the Eleventh Amendment immunity does not apply in the present case. Thus, the Court does not have subject matter jurisdiction over this case and dismissal should be without prejudice.

1

## I.    JURISDICTION

This Court has subject matter jurisdiction because Panus brings his claims under 42 U.S.C. § 1983. Dkt. No. 21; 28 U.S.C. § 1331. Venue is proper in the Abilene Division because Panus's claims arose principally from his incarceration at the Robertson Unit in Jones County, Texas. 28 U.S.C. § 1391(b)(2). United States District Court Judge James Wesley Hendrix transferred Panus's case to the undersigned for preliminary screening. Dkt. No. 24; 28 U.S.C. § 636(c)(1).

## II.    BACKGROUND

For purposes of screening a plaintiff's complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, a court must accept well-pleaded factual allegations as true and construe them in a way that most favors the plaintiff. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017).

In his Amended Complaint and questionnaire responses, Panus alleges multiple conditions relating to the food and drinking water at the Robertson Unit, as well as other TDCJ units he was assigned to over the past seven years.[2] At base, his chief complaint is that TDCJ is providing him food which lacks sufficient calories and nutrients. Dkt. No. 21 at 5. Other conditions exist that exacerbate the food deficiencies, including insufficient time to eat, unsanitary food conditions, and drinking water contaminated with per- and polyfluoro-alkyl substances (PFAS) and nanoplastics. *Id.* at 11. These conditions have existed at the Robertson Unit and in each TDCJ unit Panus has been assigned to since 2017, but they

---

[2] Many of Panus's claims would appear to be time-barred, but it is unnecessary for the Court to isolate the time-barred claims at this time.

2

became worse during the COVID-19 pandemic. Dkt. No. 23 at 1, 4.

Panus contends that TDCJ "is feeding an outdated menu that contains a lot of 'starchy and carby food.'" Dkt. No. 21 at 5. "The amount and variety of food served [at TDCJ] has been dramatically cut since the COVID pandemic." *Id*. TDCJ's distribution of food to the various units has been limited, which in turn requires unit administrators to "drastically limit the amount and variety of food served to inmates, as well as water down the food to make it stretch. *Id*. "Meals such as stews, gravy, chili, sloppy joe, and even pot pie are often about 50% water to stretch the food out." *Id*. This stretching of food has resulted in inmates "receiving caloric counts between 1,100 and 1,600 calories." *Id*.

Additionally, Panus complains that prisoners normally do not receive (1) citrus fruit and juices, (2) unprocessed meat protein, (3) probiotics, (4) dairy products, (5) fresh fruit and vegetables, (6) seeds and nuts, and (7) whole grains. *Id* at 6. As a result, his diet is deficient in calories, meat protein, calcium, iron, magnesium, probiotics, Vitamin D, Vitamin C, and zinc. *Id*. These nutrients are "the basic necessities of human existence" and being deprived of them "poses a substantial threat to Plaintiff's mental and physical health and well-being, and will likely result in premature death." *Id*.

Panus also complains that TDCJ is increasingly substituting "Johnny sack" meals for hot meals due to staffing shortages. *Id*. The Johnny sacks "do not meet the necessary caloric requirements and are void of nutritional value." *Id*. at 7. According to Panus, a typical Johnny sack contains:

3

```
BREAKFAST:
      1 pancake sandwich
            - with 1oz peanut butter and jelly mix  - 249 calories
      5 prunes                                       - 100 calories
                            TOTAL                    - 349 calories

LUNCH/DINNER:
      2 sandwiches
            - with 1oz peanut butter and jelly mix  - 269 calories
            - with 2oz slice of bologna             - 260 calories
                            TOTAL                    - 529 calories
                  TOTAL DAILY CALORIES = 1,407 calories
```

*Id.* at 7.

After Panus filed grievances related to his food, TDCJ placed him on a "Diet For Health" ("DFH") to address his dietary concerns.[3] Dkt. No. 23 at 3. Nevertheless, Panus complains that, on August 23, 2021, in the middle of the COVID-19 pandemic, he stopped receiving the DFH meals for a year and started receiving Johnny sacks. *Id.* at 17. TDCJ eventually began serving regular meals again, but still served Johnny sacks occasionally, which Panus complains violates TDCJ policy. On October 25, 2021, He received Johnny sacks twenty (20) times between September 4, 2021, and October 24, 2021, but otherwise received regular meals. *Id.* at 15.

In contrast to Johnny sacks, Panus describes the hot meals as typically including a "processed chicken patty," 4 ounces of canned carrots, 4 ounces of pinto beans, and one 3 by 3 inches square of cornbread. *Id.* at 2. Cheese may be substituted for the chicken patty

---

[3] A Diet for Health (DFH) is one of several therapeutic diets TDCJ offers to inmates who have special medical, dental, or other dietary needs that cannot be met by TDCJ's regular diet. *See* https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_policy_manual/F-47.01.pdf. (last visited June 9, 2025). Specifically, the DFH is "low in fact, low in sodium, low in sugar, and has no monosodium glutamate (MSG)." *Id.*

if an inmate wants a meat-free meal. *Id.*

Presumably for illustration purposes, Panus provides a list of foods and the nutrients they provide which would meet the nutritional standards he claims are constitutionally required:

- <u>Vitamin C</u>: citrus fruits and juices, strawberries, tomatoes, and raw cabbage (Vitamin C).

- <u>Calcium</u>: leafy, green vegetables, dairy products such as yogurt, milk and cheese, tofu, almonds, and legumes.

- <u>Iron</u>: meat, poultry, fish, legumes and green, leafy vegetables, but not isolated soy protein and beans because they have only small amounts of iron and the phytates in the body and beans inhibit the absorption of iron.

- <u>Zinc</u>: oysters, beef, chicken leg, pork chops, squash, pumpkin seeds, lentils, yogurt, oatmeal, and mushrooms.

- <u>Magnesium</u>: whole grains, legumes, and nuts.

- <u>Vitamin D</u>: sardines, salmon, cheddar cheese, cod liver oil, pork chops, eggs, mushrooms, fortified milk, and more sunshine to aid in synthesizing Vitamin D in the skin.

- <u>Probiotics</u>: sauerkraut, cottage cheese, yogurt, pickles, olives, sourdough bread, dark chocolate, kimchi, miso, kombucha, and kefir.

Dkt. No. 21 at 7–10.

In addition to the poor nutritional value of TDCJ food, Panus alleges he is given less than the TDCJ policy-allotted twenty (20) minutes to finish his meals, averaging instead 8 minutes and 51 seconds per meal. One grievance states he was given less than 20 minutes to eat on 16 occasions between May 7 and May 30, 2021.

Panus also complains that:

- mice and roaches are seen in the kitchen and often on the food.

5

- trays, cups, and utensils are of "covered with food and grease, while trays have deep gouges and scratches that harbor bacteria."

- food serving temperatures are "warm to cold"

- staff/inmates do not wear "proper PPE gear when preparing or serving food."

*Id*. at 10–11.

Lastly, Panus claims that, "upon information and belief;" the water at the Robertson Unit is contaminated with PFAS and nanoplastics from water bottles and cups. He describes the water as "cloudy," "discolored," "containing unknown particles [and] excessive calcium and mineral deposits," having a "metallic," "unnatural" or "wet dog" taste. *Id*. Panus believes the water is contaminated because of unspecified pipe ruptures in the City of Abilene's water system, which supplies water to the Robertson Unit. Dkt. No. 21-1 at 7–6.

As a result of the alleged deficiencies in TDCJ food and water, Panus claims to have developed high blood pressure, visceral fat accumulation, fatigue, anxiety, depression, brain fog, and an increased risk of hereditary diseases such as strokes, cancer, and cardiovascular diseases. Dkt. No. 23 at 3. He requested that TDCJ test him for nutritional deficiencies, but TDCJ instead placed him on the DFH meals. *Id*. Panus does not allege injuries from the sanitation issues, but claims they exposed him to an increased risk of unspecified harm. *Id.* at 4.

## III.    THE PARTIES

Panus sues six defendants: Patrick L. O'Daniel, former Chairman of the Texas Board of Criminal Justice (TBCJ); Bryan Collier, TDCJ Executive Director; Bobby Lumpkin, former Director, TDCJ-CID Division; Garth Parker, former Director of Laundry, Food

6

and Supply (LFS) Division of TDCJ; Justin Taylor, Operations Manager of the LFS Division; and Carly Kim, TDCJ Senior Dietician. Dkt. No. 21 at 3. Since filing his Complaint, some of these defendants no longer hold the position sued.[4] Thus, the Court substitutes the current holders of these positions as follows: Eric Nichols, Chairman of the Texas Board of Criminal Justice, is substituted for Patrick L. O'Daniel; Eric Guerrero, TDCJ-CID Division Director, is substituted for Bobby Lumpkin; and David Driskell, TDCJ Director of the LFS Division, is substituted for Garth Parker. *See* Fed. R. Civ. P. 25(d).

**The Clerk is directed to conform he docket to reflect these substitutions.**

Panus claims that Nichols, Collier, and Guerrero are "[l]egally responsible for creation of TDCJ policy and oversight of prisoner welfare." Dkt. No. 21 at 3. He claims that Driskell and Taylor are "[r]esponsible for food distribution to units and securing food contracts," and that Kim "[c]reated the TDCJ menu that endangers the health of TDCJ residents." *Id.* Against each of these defendants, Panus brings an Eighth Amendment conditions-of-confinement claim for their role in providing an insufficient diet and contaminated water.

## IV.    NATURE OF RELIEF SOUGHT

As relief, Panus asks the Court to enter a permanent, mandatory injunction compelling Defendants to provide him with "three wholesome and nutritional meals per day of adequate caloric quantity." *Id.* at 4. He also requests an injunction against Defendants to

---

[4] As explained below, Panus is only seeking injunctive relief; thus, his claims can only be construed against defendants in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). For this reason, it is appropriate to substitute the original defendants who are no longer in that role with the individuals who now hold that specified positions.

"stop the [TDCJ] practice of watering down food; afford adequate time to eat meals; pre-pare food in sanitary conditions;" and "provide sufficient water that is fit to drink." *Id.* Since initiating this lawsuit, Panus has also filed an "Advisory," docketed as a motion to proceed with service. The undersigned construes this "Advisory" as a motion for prelimi-nary injunction because it also states that the conditions are worsening and the "cannot be properly resolved without an injunction from this Court." Dkt. No. 29.[5]

## V.    LEGAL STANDARDS

A court must dismiss a complaint filed *in forma* pauperis or by a prisoner against a government entity or employee if the court determines the complaint is frivolous or mali-cious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B); 1915A(b) (ap-plying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions and it lacks an arguable basis in law if it contains indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

Dismissal for failure to state a claim, whether under §§ 1915(e)(2)(B)(ii), 1915A(b)(1), or under Rule 12(b)(6), "turns on the sufficiency of the 'factual allegations'

---

[5] **The Clerk is directed to re-docket Panus's "Advisory" (Dkt. No. 29) as a Motion for Preliminary Injunction.**

in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed even if the plaintiff fails to state the proper legal theory. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

For claims to be substantively plausible, a plaintiff must plead facts that permit the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

When assessing the sufficiency of factual allegations under §§ 1915(e)(2)(B)(ii), 1915A(b)(1), or under Rule 12(b)(6), courts accept *well-pleaded* factual allegations as true. *Chhim*, 836 F.3d at 469. "Well-pleaded" does not necessarily mean detailed, but the pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). A complaint that "tenders naked assertions devoid of further factual enhancement," or puts forth "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will

not suffice. *Id.* (internal citations omitted). Dismissal is appropriate where the complaint is devoid of facts to establish *any one* of the required elements of the claim asserted. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (emphasis added); *see also Chhim*, 836 F.3d at 469.

In assessing the factual sufficiency of a prisoner's allegations, the Court must consider not only the operative complaint, but also any supplementation to that complaint through documents attached to or referenced in the complaint, the prisoner's questionnaire responses, and the prisoner's *Spears* hearing testimony, if any. *Howard v. King*, 707 F.2d 215, 220 (1983) ("[T]he court was required to look beyond the inmates' formal complaint and to consider as amendments to the complaint those materials subsequently filed"); *Eason v. Holt*, 73 F.3d 600, 603 (1996) (*Spears* hearing testimony remained part of the pleadings even after prisoner amended his complaint); *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (responses to a questionnaire are incorporated into the plaintiff's pleadings). The Court may also consider other reliable evidence such as the authenticated prison records. *See Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) ("Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.").

When evaluating a complaint under these standards, courts liberally construe pro se pleadings, holding them to "less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To

demand otherwise would require the 'courts to explore exhaustively all potential claims of a *pro se* plaintiff'" and would "'transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No. 3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

## VI.    ANALYSIS

As explained above, because Panus brings this injunction action against the Defendants in their official capacities, the action is functionally against the state itself. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). For this reason, the undersigned must first evaluate whether the Eleventh Amendment bars Panus's claims prior to reaching the substance of his allegations.

A.    Whether Panus's claims are barred under the Eleventh Amendment.

Under the Eleventh Amendment, states have immunity from suit in federal court. *Quern v. Jordan*, 440 U.S. 332, 342 (1979); *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002) ("The Eleventh Amendment bars an individual from suing a state in federal court unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity."). This bar has been extended to "encompass[] not

only actions in which a state is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Sw. Bell Tel. Co. v. City of El Paso,* 243 F.3d 936, 937 (5th Cir.2001) (quoting *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429 (1997)). Thus, as a state instrumentality, TDCJ itself comes within the protections of Eleventh Amendment immunity from suit.[6]

But in *Ex parte Young*, the Supreme Court carved out an exception to Eleventh Amendment immunity to allow suits seeking *prospective* relief against a state official in their *official capacity* to prevent *future constitutional or federal statutory violations*. 209 U.S. 123 (1908); *see Aguilar v. Tex. Dep't of Criminal Justice,* 160 F.3d 1052, 1054 (5th Cir.1998). The rationale underlying the *Ex parte Young* doctrine is that state officials who violate federal law are not acting for the state, but instead as an individual, and the Eleventh Amendment does not protect individuals. *Ex parte Young*, 209 U.S. at 159–60. This rationale engages in somewhat of a fiction, in that any prospective relief ordered by a federal court against that individual would almost certainly impact the state fisc, the protection of which is one of the central purposes of the Eleventh Amendment. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). But the Supreme Court has sanctioned this fiction. *Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (stating the *Ex parte Young* exception

---

[6] *See Cox v. Texas*, 354 F. App'x 901, 902 (5th Cir. 2009) ("Under the current state of the law, the TDCJ is deemed an instrumentality of the state operating as its alter ego in carrying out a public function of the state, and is immune from suit under the Eleventh Amendment.")) (citing *Harris v. Angelina County, Tex.,* 31 F.3d 331, 338 n. 7 (5th Cir.1994); *see also Aguilar v. Tex. Dep't of Criminal Justice,* 160 F.3d 1052, 1054 (5th Cir.1998).

"permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury.").

*Ex parte Young* exception applies if the court determines the complaint (1) seeks prospective relief (2) for an ongoing violation of federal law (3) against officials who have some connection with the alleged violation. *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022); *Cantu Servs., Inc. v. Roberie*, 535 Fed. Appx. 342, 344-45 (5th Cir. 2013)). The third prong ensures that, when *Ex parte Young* is invoked, "the proper defendant is a state official acting in violation of federal law who has a 'sufficient connection' to enforcing an allegedly unconstitutional law." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021).

For purposes of screening, the undersigned assumes that each Defendant is sufficiently connected to the allegations to be proper defendants under *Ex Parte Young*.[7] Further, as discussed above, Panus seeks prospective relief only, in the form of an injunction compelling Defendants to provide him with "three wholesome and nutritional meals per day of adequate caloric quantity," to "stop the practice of watering down food; afford

---

[7] To the extent Panus alleges the food and water conditions are systemic at TDCJ, then Collier, Guerrero, and Driskell, all highly placed TDCJ executives, would be proper defendants. TBCJ Chair Nichols's involvement, though, is more attenuated. Nichols is a private attorney appointed to the TBCJ by the Texas governor. Since Panus also sues TDCJ executives, his inclusion of Nichols seems gratuitous or symbolic, rather than because Nichols is sufficiently connected to the problems alleged that he would be a proper target of an injunction to remedy them. Panus also fails to allege facts to plausibly support an inference that Taylor or Kim had control over the problems alleged to be systemic, or that an injunction against them—as opposed to Collier, Guerrero, and Driskell—would redress the conditions. Although Taylor may be "[r]esponsible for food distribution to units and securing food contracts," and Kim may be responsible for "[c]reat[ing] the TDCJ menus," there are no facts pleaded to plausibly suggest Taylor could choose the food he was operationally responsible for distributing or that Kim could choose the food available for planning menus. For this reason, if Panus's claims survive, Nichols, Taylor, and Kim should be dismissed.

adequate time to eat meals; prepare food in sanitary conditions;" and "provide sufficient water that is fit to drink." Dkt. No. 21 at 4. Thus, he satisfies two of the three prongs required for the *Ex Parte Young* exception to apply.

The remaining *Ex parte Young* inquiry is whether Panus has plausibly alleged an ongoing violation of federal law. The federal law Panus claims Defendants are violating is the Eighth Amendment's prohibition against cruel and unusual punishment. Specifically, he complains of his conditions of confinement, a claim which requires him to show deliberate indifference on the parts of the Defendants. Thus, in the context of screening a § 1983 claim seeking only prospective injunctive relief, as here, the Court's analysis begins and ends with one question: Has Panus plausibly alleged an ongoing violation of federal law? If this question is answered in the affirmative, then, having satisfied the other two *Ex parte Young* elements, Panus's conditions-of-confinement claims avoid both the Eleventh Amendment bar and dismissal through screening. In this scenario only, the Court would then consider Panus's request for a preliminary injunction and whether he has shown a substantial likelihood of success on the merits of his claims. Conversely, if Panus fails to plausibly allege an ongoing violation of federal law, his claims are barred by the Eleventh Amendment and would fail preliminary screening regardless. Of course, in this scenario, Panus would also fail to show a substantial likelihood of success on the merits

B.  Whether Panus has plausibly stated ongoing Eighth Amendment violations.

a. *Legal Standards*

"In order to establish an Eighth Amendment conditions of confinement claim, [a prisoner] would have to establish 'first, that the deprivation alleged was sufficiently serious

(i.e., an official's act or omission must have resulted in the denial of the minimal civilized measure of life's necessities)[.]" *Burleson v. Texas Dep't of Crim. Just.,* 393 F.3d 577, 589 (5th Cir. 2004) (quoting *Herman v. Holiday,* 238 F.3d 660, 664 (5th Cir.2001)). To be sufficiently serious, the deprivation must expose the prisoner to an objectively substantial risk of injury. *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Restrictive or even harsh" conditions do not create a deprivation; rather, the deprivation must be serious. *Coleman v. Dallas Cnty. Jail*, No. 3:19-cv-3009-L-BN, 2020 WL 7029915, *4 (N.D. Tex. October 22, 2020); *see Carter v. Brown*, No. 1:20-cv-01376, 2021 WL 1556374, *2 (W.D. La. April 1, 2021).

"[S]econd, [a prisoner must show] that the prison official possessed a sufficiently culpable state of mind.'" *Burleson,* 393 F.3d at 589 (quoting *Herman,* 238 F.3d at 664. "The requisite state of mind is whether 'the official acted with deliberate indifference to inmate health or safety.'" *Id.* This is "an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. J.*, 239 F.3d 752, 756 (5th Cir. 2001). "To establish deliberate indifference the [prisoner] must show that the officials '(1) were aware of facts from which an inference of excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed.'" *Burleson,* 393 F.3d at 589 (internal citations omitted). Deliberate indifference requires more than mere negligence. *Farmer*, 511 U.S. at 837. And it "cannot be inferred merely from . . . even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Thus, the "'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Domino,*

239 F.3d at 756 (quoting *Farmer,* 511 U.S. at 838).

Pertaining to the objective prong of deliberate indifference in the context of a conditions-of-confinement claim, while "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), it does not "permit inhuman ones," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prisons then have a duty to meet inmates' basic needs by furnishing reasonably adequate food, water, shelter, clothing, medical care, and a safe environment. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996); *Berry,* 192 F.3d at 507. But "[t]he deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the 'minimal civilized measure of life's necessities.'" *Berry*, 192 F.3d at 507 (quoting *Talib v. Gilley*, 138 F.3d 211, 214 n.3 (5th Cir. 1998)).

"Whether the deprivation of food falls below the [minimal civilized measure of life's necessities] depends on the amount and duration of the deprivation." *Id.; see also Mejia v. Ramirez*, No. 2:14-CV-238, 2016 WL 11473812, at *17 (S.D. Tex. Feb. 11, 2016) (stating that "[a] court must assess the amount and duration of the deprivation" to determine whether a deprivation of food is objectively serious enough to state a constitutional claim). While inmates are not entitled to three meals per day, the meals provided must be nutritionally and calorically adequate. *Green v. Ferrell*, 801 F.2d 765, 770-71 (5th Cir. 1986). But the food served to inmates does not have to be particularly appetizing. *See Alex v. Stalder*, 5:03-CV-30, 2007 WL 1231771, *1 (5th Cir. 2007) (finding the serving of food loaf, a mix of food baked into a loaf, did not rise to a constitutional violation). Courts also consider the alleged injury from the deprivation in assessing the validity of a claim. *Berry*, 192 F.3d at 508.

16

### b. Application

Applying these principles here, Panus's allegations fail to establish either prong of deliberate indifference. To start, none of his allegations regarding food deprivation are objectively serious enough to state a constitutional claim. He does not claim to have been denied any meals. Nor do his allegations plausibly support that he is being denied food in sufficient quantity or quality to constitute a constitutional violation.

To start, Panus fails to plausibly allege insufficient calories in his meals. He provides his own detailed calculations of the caloric and nutritional values of the food he receives, but does not explain the bases for or how he arrived at those numbers. Even if he accurately estimated the nutrient levels of the food he lists, he leaves out of his calculations items he chooses not to eat, as he does with cornbread, to which he assigns zero calories. *See, e.g.*, Dkt. No. 23 at 2. Although Panus believes cornbread is unhealthy and should not be part of his diet, that subjective belief—and his decision to not eat cornbread—does not mean TDCJ is objectively failing to give him sufficient calories to survive.[8] And while Panus complains about the stews, gravies, chili, sloppy joes, and pot pies being watered down, he does not explain when these are served, how often they are served, or why they do not appear in his calorie and nutrient calculations. Because Panus selectively omits certain foods from his calculations, his resulting allegation that he is only receiving 1407 calories per day is conclusory and not well-pleaded, which the Court is not bound to accept as true.

---

[8] The internal grievances Panus attaches to his Amended Complaints reflect his complaints that TDCJ food "lacks variety," that the sacked meals are high in carbs and sugar with no fruits or vegetables, and that the cornbread, unlike sliced bread, has unspecified negative health effects. Dkt. No. 21-1 at 13, 29, 41, 43.

The Court is also not required to accept as true Panus's unsupported conclusion that the meat he receives is carcinogenic.[9] His subjective fears of consuming "carcinogenic" food appear rooted in an understandable desire for a healthier diet, but that does not equate with objectively being denied the "minimal civilized measure of life's necessities" or otherwise come within eyeshot of cruel and unusual punishment. Panus's allegations simply fall short of describing a diet that is constitutionally deficient.

The same is true for the meals Panus claims he missed because the officers would not allow him a full 20 minutes to eat. Being rushed to finish eating without more does not rise to an objectively serious risk of harm. Even accepting as true that Panus is being denied a full 20 minutes to eat, he does not allege that he is unable to eat. Rather, Panus claims that being rushed "results in large amounts of unchewed food which is much more difficult for the digestive system to break down." Dkt. No. 21 at 10. But he does not claim this happens with sufficient frequency to constitute a constitutional violation. Panus would have this Court exercise its injunctive power to referee down to the minute how much time TDCJ must give inmates to eat. But courts must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." 18 U.S.C. 3626(a)(2). In the prison context, courts should exercise great caution when considering injunctive relief. *Bell v. Wolfish*, 441 U.S. 520, 547–48, 562 (1979) (recognizing the wide-ranging deference given to prison administrators to maintain

---

[9] Moreover, the FDA approves foods that contain substances that are possibly carcinogenic. *See, e.g.*, FDA, *Aspartame and Other Sweeteners in Food*, (Feb. 27, 2025), (https://www.fda.gov/food/food-additives-petitions/aspartame-and-other-sweeteners-food).

institutional security and warning courts against becoming "enmeshed in the minutiae of prison operations").

To the extent Panus contends that the sanitation issues alone are unconstitutional, these claims would also fail. *See* Dkt. No. 23 at 4. Panus claims the unsanitary conditions place him at risk of communicable disease, but he does not claim to have contracted any such diseases. Moreover, the presence of grease on food trays, scratches in silverware (which he fears harbor bacteria), and pests in the kitchen and dining areas, are not the kinds of "extremely filthy" conditions that have been found to affect the physical or mental health of inmates. *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (holding that cells covered with fecal matter, urine, dried ejaculate, and old food particles sufficient to state an Eighth Amendment claim).

Nor does Panus allege that pests infested his cell, destroyed his property, bit him, or that he plausibly suffered psychological harm from the pests' presence. *See Amos v. Cain*, No. 4:20-CV-7-DMB-JMV, 2021 WL 1080518, at *34–35 (N.D. Miss. Mar. 19, 2021) ("In determining whether a pest infestation poses an objective risk of harm, a court should consider whether (1) the pests are present in the plaintiff's cell; (2) the pests have come in contact with the plaintiff's person or property; (3) whether the plaintiff has been bitten or stung or otherwise suffered physical or psychological harm; and (4) whether the plaintiff's property has been damaged.") (citations omitted).

Even when combined, Panus's allegations about the inadequacy of the food, insufficient time to eat, and unsanitary conditions, fail to state a claim under the Eighth

19

Amendment.[10] His description of the presence of mice and roaches, while unpleasant, does not describe a condition sufficiently severe or out of control to violate the Eighth Amendment. And while the nutritional content of food is irrelevant if the food is contaminated with rodent droppings and there is insufficient time to eat, *see Gates,* 376 F.3d at 333, Panus fails to plausibly allege that insufficient time to eat or unsanitary conditions are so severe that they consistently prevent him from eating sufficient food to preserve his life.

Tellingly, although Panus has been incarcerated by TDCJ since 2017, and claims that each of the alleged conditions above existed since that time, he does not claim to have lost any weight due to insufficient nutrition, insufficient time to eat, unsanitary conditions, or any combination of these alleged conditions. Nor does he allege any other physical harm or adverse health effects that would reasonably be expected in a person who, for seven years, was fed a constitutionally deficient diet incapable of sustaining life.

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).   The undersigned finds it

---

[10] To the extent Panus contends that the sanitation issues alone are unconstitutional, these claims would also fail. *See* Dkt. No. 23 at 4. Panus claims the unsanitary conditions place him at risk of communicable disease, but he does not claim to have contracted any such diseases. His allegations about grease on food trays and pests in the kitchen and dining areas are not the kinds of "filthy conditions" that have been found to affect the physical or mental health of inmates. *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). Nor does Panus allege that the pests were in his cell, came in contact with and destroyed his property, bit him, or that he suffered psychological harm from the presence of the pests. *See Amos v. Cain*, No. 4:20-CV-7-DMB-JMV, 2021 WL 1080518, at *34–35 (N.D. Miss. Mar. 19, 2021) ("In determining whether a pest infestation poses an objective risk of harm, a court should consider whether (1) the pests are present in the plaintiff's cell; (2) the pests have come in contact with the plaintiff's person or property; (3) whether the plaintiff has been bitten or stung or otherwise suffered physical or psychological harm; and (4) whether the plaintiff's property has been damaged.") (citations omitted).

implausible that a person who was deprived of sufficient food and clean water to survive, and thus exposed to a substantial risk of serious harm, would, after seven years of such deprivation, experience nothing more than high-blood pressure, increased visceral fat, fatigue, anxiety, depression, brain fog, and an increased risk of hereditary diseases.

Panus next alleges that, "[u]pon information and belief," the water at TDCJ is contaminated with PFAS and nanoplastics. Dkt. No. 21 at 11. He also describes the water as "cloudy," "discolored," "containing unknown particles [and] excessive calcium and mineral deposits," having a "metallic," "unnatural" or "wet dog" taste. *Id*. at 10–11.

"Obviously, potable water is a basic human need and must be provided to inmates." *Simmons v. Hooper*, Civil Action No. 1:18-CV-0069-BU, 2021 WL 861716, at *24 (N.D. Tex. Jan. 13, 2021), *recommendation adopted by* 2021 WL 859129 (Mar. 8, 2021). But "inmates are not entitled to completely pristine conditions of confinement, including drinking water." *Stapleton v. Carr*, 438 F. Supp. 3d 925, 938 (W.D. Wis. 2020). Even "'brown, bad-tasting water,' by itself, 'fail[s] to state a constitutional claim' or to establish that the water is unsafe." *Lee v. Davis*, 2021 WL 4185881, at *3 (E.D. Tex. Aug. 9, 2021), *report and recommendation adopted*, 2021 WL 4168610 (E.D. Tex. Sept. 14, 2021) (internal quotations omitted). "According to the Environmental Protection Agency, fifteen known impurities in drinking water can affect 'aesthetic considerations, such as taste, color, and odor,' but 'are not considered to present a risk to human health.'" *Id.* (quoting Secondary Drinking Water Standards: Guidance for Nuisance Chemicals, https://www.epa.gov/sdwa/secondarydrinking-water-standards-guidance-nuisance-chemicals) (last visited July 23, 2025). Thus, "failing to provide a maximally safe environment,

one completely free from pollution or safety hazards, is not [cruel and unusual punishment]." *McCray v. Cupp*, No. 23-0820, 2023 WL 6209423, at *11 (W.D. La. Sep. 5, 2023) (quoting *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001)).

There is no clear line on when a water contaminant, assuming it is present, becomes unconstitutional. Panus does not claim to have suffered any harm from drinking the water, or any dehydration from not being able to drink it. When asked if he had any injuries that could support his allegations that the water has unacceptable levels of PFAS, Panus replied that he did not have to show an injury, but only a substantial risk of serious harm. Dkt. No. 23 at 5. While this statement is true, it is not plausible that Panus has been daily drinking contaminated water since December 2017 and yet has not experienced any ill effects from doing so. *See id.* at 4.

Panus's water allegations are too speculative and thin to support an Eighth Amendment claim, particularly in the absence of any ill effects. Accepted as true, the facts alleged do not support that the Robertson Unit's water, which Panus admits is supplied by the City of Abilene, as is the Court's drinking water, is constitutionally deficient. To the extent Panus blames the water conditions on ruptured water supply lines between the City of Abilene and the Robertson Unit, these allegations are also conclusory. He does not allege when these water pipe ruptures occurred, how long they lasted, or how he knew of the ruptures. He also does not claim that TDCJ had any control over the quality of water received from the City of Abilene. Dkt. No. 21–1 at 7–7.

Additionally, Panus's allegations that the water contains harmful levels of PFAS, nanoplastics, or any other contaminants are speculative and conclusory. He does not allege

facts showing how he knows this, what the tolerable levels of these alleged contaminants are, whether the contaminants—assuming they are present—exceed the tolerable level, or that he was harmed by drinking the water. Standing alone, his complaints about the smell, taste, and appearance of the water fail to plausibly support an inference that the water contains unacceptable levels of PFAS, nanoplastics, or other harmful contaminants.

Accepting as true those allegations the Court must, Panus's factual allegations fail to plausibly support that he was denied reasonably adequate food, water, sanitation, or other "minimal civilized measure of life's necessities." *Berry*, 192 F.3d at 507; *see Hare*, 74 F.3d at 639.

Finally, Panus also fails to plausibly establish the subjective prong of deliberate indifference. The only allegations on this issue describe an alleged radio interview of Parker in which he said that the "menus that we are serving currently, you know, we're serving a 1970s, 1980s menu and we understand that . . . you know, we serve a lot of starchy and carby food, and we understand that . . . we're concerned about the health of individuals that—that eat the food we have." Dkt. No. 21 at 5. Accepting as true that Parker made these statements, they fall short of plausibly establishing that Parker, or any other TDCJ official, was aware of facts from which an inference of *excessive* risk to the prisoner's health or safety could be drawn and that Parker actually drew such an inference. *Burleson*, 393 F.3d at 589 (internal citations omitted). For Parker to publicly acknowledge that TDCJ food is high in starch and carbohydrates, and even to acknowledge that such a diet is not particularly healthy, is not an admission that such a diet poses an *excessive* risk to inmate health.

At base, Panus's claim is based on being denied the types of food he considers to be optimal to good health. But "[i]nmates cannot expect the amenities, conveniences and services of a good hotel" *Wilson v. Lynaugh*, 878 F.2d 846, 849, n.5 (5th Cir. 1989). "[T]he Eighth Amendment may afford protection against conditions of confinement which constitute health threats but not against those which cause mere discomfort or inconvenience." *Id*. at 849.

## VII.   CONCLUSION

Panus's failure to plausibly allege an ongoing violation of his Eighth Amendment rights prevents his use of the *Ex parte Young* exception, which means his underlying conditions-of-confinement claims, and the permanent injunction relief sought therein, are barred by the Eleventh Amendment. For the same reasons, he is unable to show a substantial likelihood of success required for preliminary injunctive relief.

For these reasons, the undersigned magistrate judge RECOMMENDS that the Court DISMISS all claims WITHOUT PREJUDICE. *See* Dkt. No. 29.

## VIII.  RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed de-

termination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## IX.    TRANSFER OF CASE

Having completed the preliminary screening of Panus's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action No. 1:23-cv-00086-H-BU.

SUBMITTED this 24th day of July 2025.


_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE